

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**06/03/2015**

| | | |
|---|---|---|
| IN RE: | § | |
| RUSSELL E. BENTLEY | § | |
| GAYLA S. BENTLEY | § | |
| DEBTOR(S) | § | CASE NO. 12-36352-H5 |
| | § | |
| MICHAEL METZ | § | |
| | § | |
| PLAINTIFF(S) | § | ADVERSARY NO. 13-3012 |
| | § | |
| VS. | § | |
| RUSSELL E. BENTLEY | § | |
| GAYLA S. BENTLEY | § | |
| | § | |
| DEFENDANT(S) | § | |

## Memorandum Opinion

Before the Court is the first amended complaint of Michael Metz to

determine whether debtors may  discharge his debt under 11 U.S.C.§§

523(a)(2)(A)  and  (B)  and  (a)(19).  Metz  complains  that  debtors'

misrepresentations induced him to invest in Gayla Bentley, L.P. and that he

gave $100,000.00 to debtors based on debtors' false representations and

material omissions. Metz alleges the Bentleys committed common law

fraud, fraudulent inducement, deceit, manipulation, and securities fraud in violation of Tex. Rev. Civ. Stat. art. 581-33(A)(1) and (A)(2). Metz seeks an award of damages and to bar the Bentleys' discharge based upon 11 U.S.C. §523(a)(2) and (a)(l9).

Specifically, Metz maintains debtors orally, in a letter, and in a business plan for Gayla Bentley, L.P. falsely represented to him: (1) the relationship between Gayla Bentley, L.P. and its "Far East" manufacturer, (2) the financial performance, profit margins, liabilities, and debts of Gayla Bentley, L.P. when the Bentleys knew, as of October of 2006, that sales, revenues, and profits were far below those represented to Metz; (3) the status of financing of Gayla Bentley, L.P., (4) the operations and supposed business relationships/customers of the company; (5) the company's overall profitability; (6) the intended use of his investment; (7) the stores where the company's line of clothing was being sold; (8) the existence of a factoring and financing relationship with Summit Financial Services; (9) the existence of an overseas manufacturing partnership/relationship; and (10)

the existence of a New York showroom.[1] The Bentleys maintain they made

no misrepresentations and Metz' debt is dischargeable.

This Court has jurisdiction over this proceeding under 28 U.S.C.§§

1334 and 157. This is a core proceeding. After trial, the Court finds and

concludes Metz has failed to prove his debt is nondischargeable under 11

U.S.C.§§ 523(a)(2)(A) or (B) or (a)(19). The Bentleys are awarded their

discharge. Metz debt is discharged.

## I. Findings of Fact

## A. Parties

Gayla Bentley attended the University of Rhode Island and was

employed thereafter in Houston by Sakowitz and Saks Fifth Avenue. At

Saks, she was in charge of a consultants group which provided shopping

---

[1]Metz' original complaint alleged only that Metz had invested in Gayla Bentley, L.P. based on the Bentleys representation that only 10% of the company would be sold to investors. Metz further alleged that subsequent to his investment, the Bentleys attempted to sell more than 10% of the company. The Bentleys filed a motion for summary judgment, the Court held a hearing and Metz moved to amend his complaint. The Court granted Metz leave to amend. It is in Metz' first amended complaint that he first alleges that the letter he received in April 2006 and the Gayla Bentley L.P. business plan make misrepresentations upon which he relied in lending $100,000 to the company.

services to Saks' customers. Her services were involved with "dressing" and meeting their shopping needs.

Subsequently, in 1991 Gayla Bentley was in a car accident and suffered a broken neck which required rehabilitation for three years. When she was able to return to work, she began her own consulting business to provide private clients with dressing and shopping services, under the name of Gayla Bentley, L.P.

Gayla Bentley has given lectures on fashion at Rice University, the University of Houston, and Houston Community College. She received the Rising Star award from the Fashion Group International, the Business Woman of the Year award from the National Association of Women Owned Businesses, and given an award from the Governor of Texas for business leadership for women. (Doc. 50 p.11-12) She appeared in articles in Womens' Wear Daily, the Oprah magazine, Glamour, and USA Today (D. Ex.22). MSNBC came to Houston and produced a show featuring Gayla Bentley L.P.

Russell Bentley is a petroleum engineer. He obtained an MBA in

1997. Russell Bentley left Duke Energy in 2003, to work with his wife in their business. Although he left Duke Energy, Russell Bentley continued working in petroleum engineering on consulting jobs over the next several years and invested his earnings into the business.

Michael Metz graduated from Case Western Reserve and has a master's degree in international affairs from Tufts University. Metz is employed at Vitol, Inc. and has been a commodities trader for twenty-six years. Metz is an experienced businessman who earns more than $200,000 a year. Metz testified he has a net worth of more than $1 million.

Metz has known the debtors socially since he met them in the mid 1990's through his wife. Metz is married to Clare Casademont. Clare Casademont was a television news anchor for Channel 11 in Houston, Texas. In 1995, Casademont hired and paid Gayla Bentley to be her personal wardrobe consultant for Casademont's appearances on television. Casademont testified, "I purchased my own clothes with my own money, and then she would come to my house and we would lay out clothes for two or three weeks at a time, accessorizing it, thinking about how it would

appear on the air, and that kind of thing. We would critique some things that I had maybe worn earlier deciding whether it was effective or not." Casademont's work relationship with Gayla Bentley ended in 1997 when Casademont and Metz moved to London and Casademont no longer appeared on television.

Casademont graduated Phi Beta Kappa from Trinity College in Hartford, Connecticut. At age 47, Casademont returned to school and obtained an MSW in Clinical Social Work from Smith College, School For Social Work in North Hampton, Massachusetts. Until recently, Casademont was practicing at the Nick Finnegan Counseling Center.

## B. The business

The Bentleys formed Gayla Bentley, L.P. out of their home in 2001 to sell women's plus-sized clothing and accessories. Gayla Bentley provided the fashion expertise to the business and her husband, Russell Bentley, ran the financial aspects of the business. They began operation of Gayla Bentley L.P. with a little over $200,000 taken from Russell Bentley's 401(k) account from Duke Energy and grew the business to the point when

in 2003, they decided to "have a regular office." In addition, Frost Bank funded two SBA loans totaling $80,000. During this time, debtors' personal savings, the SBA loans, and the cash flow generated from sales at various stores funded the company's day-to-day operations.

In August 2006, the business obtained its first loan from an individual, Jim Shaffer, in the amount of $50,000. In 2007 or 2008, the Bentleys refinanced their home to access equity to invest in the business. In addition, in 2008, Wells Fargo extended a line of credit to the business.

These funds were used for "operating expenses, primarily salaries, fabrics, travel to the markets and things like that." Russell Bentley explained, one of the chief complaints in the plus size women's clothing market is about the fit of the clothing ". . . so we really needed to do a lot of R&D on the fit issue to get it right to have the clothes fit." To assure a proper fit of the clothing designed, the business bought a computer-aided design (CAD) system.

Russell Bentley determined the capital needs for the business by looking at the overall cost of the garments. Russell Bentley testified, "[W]e

had a fairly good idea of what a particular garment would cost retail and what we could make a -- supposedly a profit from as a wholesale piece as well. And so we would then -- depending on what we felt like the buyer would buy from us, I mean, we would have a forecast of how much fabric we needed to buy, things like that."

In September 2005, Gayla Bentley traveled to Hong Kong and Sri Lanka to make final decisions on fabrics and the operations with the manufacturer. She testified that Russell Bentley had made and installed a system from the Gayla Bentley L.P. office so that, "you could press a button and actually send it to the Sri Lanka office and the Hong Kong office and they could receive our patterns, and we tested that while I was there. Russell would send a pattern, we tested things to make sure they would work accurately when the patterns arrived so we could really, you know, stay on schedule and fulfill our obligations. And my -- the people that went with me would meet their counterparts on those trips so they would know who they would be speaking to via computer or telephones to make sure things were accurately, you know, corresponding and all that."

## C. The Bentleys' meeting with Metz

Metz testified that in early 2006 his wife, Clare Casademont, first approached him about investing in Gayla Bentley, L.P. Metz testified, "Well, I think initially Clare told me about it through her discussions with Gayla, and then Russell and Gayla came to our house and presented their ideas to us."

The purpose of the meeting in April 2006 was to discuss Metz investing in Gayla Bentley L.P. Metz testified, "Well, they presented their proposal about their business. They discussed the idea of breaking into the plus-size market, that it was a big market, and that it really wasn't served, and that they had capabilities in terms of financing and manufacturing that was going to enable them to break into that market." Metz explained why the Bentleys wanted him to invest in their business, "Well, we were told that our investment was needed to boost the sales, to kind of take them from the ground, where they were in terms of sales, and to try to use that money for advancing sales, because, as I said, that they had told us they had a financing arm lined up -- because that was one of my issues, was the

money going to be used for financing. They also had a manufacturer, a low-cost manufacturer, that they told us they had arranged -- entered a partnership with in the Far East. So, the proposal that was presented was: We have this idea; we have a niche that needs to be filled; we have the manufacturing and the financing to get there, but we need the marketing (slash) sales to -- to get us -- to generate the kind of numbers that we are forecasting in the business plan." Metz testified about the stores that the Bentleys hoped would sell the clothing, "I think at that point they were in Neiman's on line, and they were telling us that they were hopeful and expectant to be in Dillard's, I think, first, and then Neiman's second possibly, followed by either Sak's or Bloomingdale's." Metz testified that at the end of the meeting, "We agreed to think about it and said we would discuss it and get back to them about it."

## D. The April 2006 letter

After meeting with the Metzes at their home, the Bentleys sent a follow up letter to Metz dated April 11, 2006. Michael Metz contends debtors in this letter made material misrepresentations which lead him to

invest. The letter dated April 11, 2006, and signed by Russell Bentley, as

chairman and CEO of Gayla Bentley, L.P. states:

> Dear Clare and Michael:
>
> Thank you so much for meeting with Gayla and me last Saturday.
>
> I hope that we were able to give you a compelling overview of our activities and future potential:
>
> 1) Our 5 years of research and development have produced a proven fit and winning design that establishes brand loyalty and keeps women returning season after season.
>
> 2) We are just starting to realize returns on this investment, first with Neiman Marcus Online (dramatic growth each season), second with 23 new boutiques nationwide and soon to be in a nationwide chain (e.g. Dillard's, Bloomingdale's).
>
> 3) Summit Financial Services in Houston has offered to start Factoring and Purchase Order financing services with us. A $500,000 line of credit with them will allow us to produce large orders for Dillard's, Bloomingdale's, Lord & Taylor, and others.
>
> 4) We have a reliable, established manufacturer overseas recognized through the industry as reputable with timely deliveries. They will enable us to capture increasingly large orders easily.
>
> 5) Our Far East presence allowed us to launch our moderately priced Gayla Bentley Signature line this year to a much broader

retail audience.

6) We opened a New York showroom in February 2006 – a necessary vehicle to springboard marketing to the fashion industry.

7) Our brand identity and profile continue to grow as more and more media realize the demand for our product.

Thank you for considering joining our team. Your contribution will help us continue the momentum we have created and give women around the world a fresh new choice in fashion. Please let me know if any further discussion points or questions arise. My Email is russell@gaylabentley.com.

I will call you in a couple of weeks to follow up with you on this opportunity.

Warmest regards,
Russell Bentley
Chairman and CEO
Gayla Benley. L.P.

## 1. First alleged misrepresentation

Metz testified the first misrepresentation is, "Our 5 years of research and development have produced a proven fit and winning design that establishes brand loyalty and keeps women returning season after season." Metz testified that that representation, "was more about Gayla's general,

you know, background of having dressed women and helped women in that -- in that element." Metz testified, " . . . I knew Gayla had, obviously, done that for my wife and did it as a consultant, I believe, for a number of people in Houston, and that was the main background that I knew she had." The Court finds that the first representation is truthful.

## 2. Second alleged misrepresentation

The second statement in the letter is "We are just starting to realize returns on this investment, first with Neiman Marcus Online (dramatic growth each season), second with 23 new boutiques nationwide and soon to be in a nationwide chain (e.g. Dillard's, Bloomingdale's)." Metz testified about his reaction to this information, "Well, that's -- that's impressive. I mean, if you're in, you know, boutiques nationally and you have -- you know, you're going to be in the national wide -- a nationwide firm like Dillard's, that's -- that's what you want to do in order to achieve the goal of, you know, selling and breaking into that market." Asked to distinguish whether he was told that the representation, "soon to be in a nationwide chain," "was a possibility, or that the clothing line was going to be sold in

these stores," Metz testified "that was presented as a -- as a strong assurance that that was going to happen." Metz testified, "I think the first target was Dillard's."

Russell Bentley testified that the company had an established business with Neiman's and Nordstrom's. Russell Bentley never told the Metzes that a contract had been entered into with Neiman Marcus or Nordstrom's to sell clothing in their brick-and-mortar stores. Russell Bentley testified, "we'd been established with Nordstrom already. Neiman Marcus came on, I believe, in 2005 and so we were beginning to get revenues in with Neiman Marcus. They were very excited about our styles and it was growing. Our -- we were also visiting the trade shows nationally and at that point, I believe in this letter, we had counted up 23 new boutiques nationwide that we were servicing and then soon to be a nationwide chain."

Debtor's B12 is the list of the boutiques for which Gayla Bentley LP was making clothes.

The Court finds that in April 2006, Gayla Bentley L.P. was in fact selling clothes through Neiman Marcus Online and through at least 23

boutiques. The Court finds that Metz understood the phrase "soon to be in a nationwide chain" as a statement of the Bentleys' intentions for the company for the future, rather than a representation that the company already had secured an agreement with a nationwide chain to place its clothing in its brick and mortar stores. The Court finds that there is no evidence that at the time the Bentleys represented to Metz, their goals for the future of Gayla Bentley, L.P. that the Bentleys lacked the intention to fulfill these goals or in any way falsely stated their intentions.

## 3. Third alleged misrepresentation

The third representation made in the letter is, "Summit Financial Services in Houston has offered to start Factoring and Purchase Order financing services with us. A $500,000 line of credit with them will allow us to produce large orders for Dillard's, Bloomingdale's, Lord & Taylor, and others." Metz testified, "That was very important to me, because that -- that said to me that they had the financing to -- I didn't know the details of what they needed to run their business, per se, but I knew if they had a line of credit established that they would be able to, you know, at least start

the business, and as they made more sales they would be able to increase their lines of credit, because typically that's how it worked. So, that was -- that was important." Asked whether he took this to mean that they were filling orders with this line of credit at those stores, Metz testified that he understood the representation to be forward looking, "Well, I read that as that they were going to be able to produce whatever orders they received from those companies because they had this financing." Asked whether he understood that orders were going to be placed by the stores that were listed, Metz testified, "Well, I -- I assumed that they were going to be doing that with Dillard's. That's -- that's -- Dillard's was always the company that was presented as the first one, and Neiman's was the second. So, that just tied in to what they had told us earlier about having -- you know, that they were going to be in this nationwide chain, so – ."

Russell Bentley testified that there was a verbal agreement with Summit Financial Services for a line of credit. He had had discussions with Summit Financial Services relating to a line of credit in either 2005 or 2006 and had provided financial statements. In April 2006, he had a verbal

agreement with Steve Hansen at Summit Financial Services for a line of credit had the company obtained a purchase order. Russell Bentley testified, "We had it all set up to go when we got the purchase order. But the purchase order didn't come, so we didn't kick into the contract. So in answer to your question, no, we didn't have the line of credit." Russell Bentley further testified, "What I was trying to say was that we were all set to take advantage of that first purchase order when Dillard's, Bloomingdale's, Lord & Taylor or others gave us the orders. You know, I mean, you can't just -- once they give you the order, you have to go to work immediately and secure the fabric, the manufacturer and everything else and so typically that's done either with an LC or a factoring agreement."

Metz' counsel argues that debtors' letter makes the representation that the company has a "half million dollar line of credit with Summit Financial Services." The Court finds that the statement, "Summit Financial Services in Houston has offered to start Factoring and Purchase Order financing services with us" is true. The Court further finds that the additional statement "A $500,000 line of credit with them will allow us to produce

large orders for Dillard's, Bloomingdale's, Lord & Taylor, and others," is a statement of the author's opinion about what the company could achieve with a $500,000 line of credit. The Court finds that these statements are not misrepresentations.

### 4. Fourth alleged misrepresentation

The fourth representation made by the letter is, "We have a reliable, established manufacturer overseas recognized through the industry as reputable with timely deliveries. They will enable us to capture increasingly large orders easily." Russell Bentley testified that the fourth point of the April 2006 letter refers to KSP Hoodvin, a clothing manufacturer located in Hong Kong and other locations in the Far East. At the time of the April 2006 letter to Metz, Gayla Bentley L.P. had established a business arrangement with KSP Hoodvin for KSP Hoodvin to manufacture clothing for Gayla Bentley L.P. Gayla Bentley L.P. had paid thousands of dollars to KSP Hoodvin and KSP Hoodvin delivered product.

Gayla Bentley testified that Gayla Bentley L.P. had a verbal agreement with Hoodvin and KSP to manufacture the company's clothing.

Metz v Bentley 060315.wpd

The Court finds that as of April 2006, Gayla Bentley LP had an overseas manufacturer for its clothing. The Court finds that the fourth representation is true.

## 5. Fifth alleged misrepresentation

The fifth statement is, "Our Far East presence allowed us to launch our moderately priced Gayla Bentley Signature line this year to a much broader retail audience." Metz testified he knew the Bentleys were already in business. "They were already producing clothes. And, so, it was -- the idea was to just expand that market." The Court agrees with Metz that this representation is true.

## 6. Sixth alleged misrepresentation

The sixth statement is, "We opened a New York showroom in February 2006 – a necessary vehicle to springboard marketing to the fashion industry." Russell Bentley explained Gayla Bentley L.P. contracted with Piaffe Professionals, "a showroom company that we hired to show our goods. They were there on an annual basis. They traveled around to many

trade shows and represented our lines to the various buyers at these trade

shows and we had a presence in their showroom....[with] a 365-day-a-year

presence for Gayla Bentley in New York City." Russell Bentley testified,

in addition to the showroom with Piaffe Professionals, Gayla Bentley L.P.

had a kiosk during Fashion Week in New York which is a market area

" where the buyers come to visit the various designers."

   Gayla Bentley testified that she did a photo shoot for the New York

showroom at Michael and Clare's house in February 2006. The Court finds

that the sixth representation is true.

## 7. Seventh alleged misrepresentation

   The seventh statement in the letter is, "Our brand identity and profile

continue to grow as more and more media realize the demand for our

product." Metz testified he knew "Gayla and Russell were actively, you

know, courting -- if you will, courting the media to try to get more exposure

for their clothing. So, they were, you know, trying to get in magazines and

get on different television shows and that type of thing." Russell and Gayla

Bentley both testified about the substantial media coverage for Gayla

Bentley, L.P. The Court finds that the seventh statement is true.

## 8. Conclusion of letter

The conclusion of the letter states, "Thank you for considering joining

our team. Your contribution will help us continue the momentum we have

created and give women around the world a fresh new choice in fashion.

Please let me know if any further discussion points or questions arise. My

Email is russell@gaylabentley.com." Metz testified he knew "they were

producing clothes and then they -- you know, they saw this very large

market, and the issue was trying to go from being on a small scale to a large

scale and trying to break into, you know, international and national

markets."

Russell Bentley testified about momentum. Russell Bentley testified,

". . . as far as building a brand, we were hot." The Court finds that the

evidence shows that the company indeed had "momentum" in April 2006,

Metz understood the debtors' intended meaning of the word momentum

and there was no misrepresentation made in the conclusion of the letter. The Court finds there is no evidence that any of the representations in the letter dated April 11, 2006 were false.

## E. The November 2005 Business Plan

In November 2005, Russell Bentley created a written business plan for the company with the assistance of Lea Fastow. Russell Bentley used computer software available for that purpose. Russell Bentley testified that the source of the financial information depicted in the November 2005 business plan was his QuickBooks software.

Russell Bentley believes he sent the November 2005 business plan to Michael Metz in November 2005. Metz denies receiving the business plan in November 2005. Metz testified that he read the November 2005 business plan in April 2006.

## 1. Company ownership

The November 2005 business plan[2] explains the company's

---

[2]Section 2.1

ownership:

> Gayla and Russell Bentley are the sole Limited Partners of
> Gayla Bentley, L.P., a Regulation D Exempt Limited
> Partnership formed in Texas in 2001. They are also the
> Directors of the General Partner, Gayla Affairs, Inc., a Texas
> Corporation formed in 1997 to provide fashion and style
> services in the U.S. and abroad. There are currently no other
> limited partners of Gayla Bentley, L.P.

## 2. Plans for expansion into "mass market" through mid-priced retailers

The November 2005 business plan explains that up to this point Gayla

Bentley L.P.'s sales have been of its luxury line, "Gayla Bentley," to a

customer base of "over 500 high net worth customers"[3] and that the "Gayla

Bentley" line "currently serv[es] as an established vendor to Neiman

Marcus Direct and Nordstrom, Inc."[4] The November 2005 business plan

explains that to expand business and "target a mass market" the company

intends to launch a mid-priced line of clothing, "Gayla Bentley Signature,"

---

[3]Section 1.2

[4]Section 2

that would be sold through mid-price retailers[5] such as QVC, Dillard 's, JC Penney, and Beall's.[6] In addition, the company wants to launch "Bentley Basics," a line of clothing "attractive to both types of retailers." To accomplish these goals, the company seeks to raise $250,000 by selling a 10% equity stake in the company.

The Executive Summary[7] of the November 2005 business plan explains the company's strategy for entering the mid-price markets in the future. In the short term, the company will "lever our luxury line's success in the Plus Size market with our relationship with our Far East fabric source and manufacturer into a scale of operation that will allow us price and market access through other major apparel retailers." The Executive Summary continues:

_____

[5]Section 1.2

[6]Section 2

[7]Section 1

Metz v Bentley 060315.wpd                 Page 24 of 64

In February 2006, we will present our three Fall Collection labels to 15 major retailers. Our goal is to secure orders from at least 3 of them for Fall 2006 and to establish profitability on a gross basis for the Company by the end of the calendar year.

We feel this is a reasonable goal given that there are very few designers who specifically design for the Plus Size market. Significantly, it is the Plus Size apparel market which is experiencing the most demand, but has among the lowest supply of any other apparel segment. Therefore, major retailers are anxious to see new products.

The long term strategy for the company is to leverage off of our retail and brand presence to become positioned for Catalog, Internet, and other Direct Market distribution channels. GBLP is likely to attract a retail partner for longer-term capital needs as the business grows.

## 3. Company history

The November 2005 business plan includes the company's

accomplishments[8]:

Our first Collection debuted in April 2002, and generated over $50,000 revenues in 3 days.

In April 2003 we opened our showroom to showcase our designs to retailers and to sell to our many private clients.

---

[8]Section 2.2

Metz v Bentley 060315.wpd

. . . . we have also accomplished the following milestones in addition to the ones noted above:

Significantly increased our private customer base.

Entered into vendor relationships with Neiman Marcus Direct (the online division of Neiman Marcus) and Nordstrom, Inc. By the end of 2005, wholesale revenues are expected to top $100,000.

Created greater value and awareness of the Gayla Bentley brand through our website.
Established significant media contacts including local and national TV coverage, numerous stories and articles written about us in local and national newspapers and magazines.

Sourced economic and seasoned manufacturing in the Far East, enhancing our three distinct apparel lines for the three price points and retailers targeted.

Presented our credentials to The Doneger Group and The Tobe Report, the Fashion industry's primary information sources for major apparel retailers in the US and abroad. Both companies are excited about our designs and plan to begin reporting on Gayla Bentley beginning in November, 2005 (for the Summer 2006 season).

Of note, the new relationship with our Far East manufacturer will enable us to have a manufacturing and distribution infrastructure comparable with many Fortune 500 apparel companies. (See Appendix A)

## 4. Historical financial information

The November 2005 business plan includes historical financial information through October 2005. The November 2005 business plan shows that in 2003, the company had sales of $115,550, gross profits of $10,307, and operating expenses of $146,000. Earnings for 2003 were -$135,420, and partners capital was reduced from $84,820 to -$50,600. In 2004, sales were $220,512, gross profits were $170,000 and operating expenses were $207,107, earnings were -$37,470, and partners capital was reduced from $27,190 to -$10,280. The November 2005 business plan shows that as of October 2005, sales were $212,190, gross profits were $121,920 and operating expenses were $166,320, earnings were -$44,423, and partners capital was reduced from $19,708 to -$24,715. The Court finds that the November 2005 business plan discloses that the business lost money every year of operation.[9] In addition, the November 2005 business plan explains that the company's cash flow to date "has not been sufficient

---

[9]Indeed, even Metz' counsel concedes the fact that the November 2005 business plan shows, "that in 2005 the company was losing significant money. . . " and "[w]hen you go down to the bottom, you lost $37,000 in 2004 and $44,000 to date in 2005 . . . " Doc. 50, p. 83.

to drive the long term success of the company."[10]

## 5. Projected sales figure are based on "important assumptions"

The November 2005 business plan identifies four "important assumptions" upon which the sales projections stated in the document are based.[11] As assumptions, the four statements are not statements of existing fact, but rather are representations about what must exist for the projections contained in the November 2005 business plan to materialize. The four assumptions are:

1. Financing will be in place prior to year end 2005 to fund Company operations through 2006.

2. During the first quarter of 2006, significant new (Fall 2006) business will be added from major new mid-price retailers to supplement the growing luxury sales.

3. Additional lines of credit or other form of purchase order financing will be pursued during the second quarter based on the new Fall, 2006 business.

4. The Company will be fully self-sufficient and profitable by year end 2006. The four assumptions are followed by the break

---

[10]Section 7.4

[11]Section 7.1

even analysis at section 7.2. The break even analysis describes that company's annual income was $755,592 then on a monthly basis current available cost would be 55%.

Metz testified, "I assumed, based on what they had told us, that they had the financing... They needed the money for increasing sales through marketing, not through -- not for the financing element, not for the manufacturing element." The Court finds that Metz funds were used for operating expenses of the company. Contrary to Metz' testimony, the Court finds that the funds Metz loaned to Gayla Bentley L.P. were not restricted in any way as to their use.

Metz testified that the fourth assumption amounts to a representation that the company would in fact be self sufficient by year end 2006. Metz also testified, however, that the statement in section 7.4 of the November 2005 business plan, that in "2007, 2008 to 2010," the company's "[c]ash flow will be significantly higher with the mid-price retailers assuming more of the revenue stream, "meant that the company would be completely self sufficient by 2007 if it obtained additional funds and increased sales."

(Doc. 49, p. 45-46.)

The Court finds Metz testimony that he thought the company would be self sufficient by the end of 2006 is not credible in light of the fact that he knew that the company's cash flow problems would continue to be a concern. Further, the Court finds that Metz knew that the company could increase its sales significantly only by entering the mid-priced wholesale market as explained repeatedly throughout the November 2005 business plan. The Court further finds when he loaned $100,000 to the company, Metz knew that Gayla Bentley L.P. was not yet selling its clothes in a "brick and mortar" mid-priced retailer such as Dillards.

## 6. Cost of goods sold

In section 7.2, the November 2005 business plan represents that the cost of goods sold "are estimated to be 55 percent." Metz testified, "I figured if costs of goods are a little bit more than half of what your revenues are, the rest is profit. So, it seemed to be something that would make sense from a business standpoint." (Doc. 49, p. 44-45.) Metz's

counsel points out that the Gayla Bentley, L.P. Profit and Loss Report for January through December, 2006, plaintiff's Ex. 5, indicates that costs of goods sold for 2006 were 92.79 percent, not 55 percent.

Although Russell Bentley testified that he agreed with Metz' counsel that "this is a -- basically a statement that the cost to make this apparel is roughly 55 percent," the Court finds that rather than a representation of existing fact, the "55 %" "average percent variable cost" that appears under the heading "Break-even Analysis," is plainly identified as yet another assumption upon which the break even analysis is based. Moreover, Russell Bentley testified that the profit and loss for 2006 reflects "how costs of goods is broken out within QuickBooks . . . [and that it] could lump certain things into cost of goods sold that I wouldn't, as an apparel manager, consider cost of goods sold." The Court credits Russell Bentley's testimony. To the extent that Metz complains that Russell Bentley failed to update him about the cost of goods sold at the time of his investment, the Court finds that there is no evidence that Russell Bentley knew the costs of

goods sold as of October 2006. The Court further finds that there is no evidence that Russell Bentley intended to misrepresent the cost of goods sold.

## 7. Sales projections

Based on the four assumptions, the November 2005 business plan sets out projected sales for 2006 totaling $860,000. In fact, by year end 2006, Gayla Bentley L.P.'s actual total sales for 2006 were $314,908. (plaintiff's Ex. 5) Russell Bentley testified that as of October of 2006, he knew "...we were having challenges but that we were overcoming those and able to pay our bills. ...[W]e continued to have good business and Neiman Marcus and Nordstrom and we could have made up things in one big, fell swoop with Dillard's coming on or Bloomingdale's coming on, or somebody like that. We were always holding out for that big fish to finally come in."

The November 2005 business plan includes projected sales for 2007 in the amount of $2,000,000. Metz testified that the large increase in sales

projected from 2006 to 2007 was, "primarily because they were going to be represented by a national chain or several national chains" and that the company, "needed the money to get to that point." Metz further testified that he was told the clothes would be "on the racks in these national chains." (Doc.49, p. 41) The Court finds that Metz understood the prospective nature of Gayla Bentley L.P.'s goal to place its clothing lines in national chains. The Court finds that Metz did not believe at the time he invested that the clothing lines already were being sold in national chains.

The November 2005 business plan, section 1.3, contains the statement, "Low cost manufacturing maximizing our Far East partner's labor and fabric resources in a timely manner without sacrificing product quality." Metz testified, "It said to me that they had a financial arrangement and a partner -- a partner -- I'm in a partnership. A partnership means you have a financial arrangement with those people that you're working with. And, so, again, that said to me that they have this manufacturing entity lined up and that they are working with them to produce the clothes."

Metz gave additional testimony about the business plan's use of the word "partner" in reference to the clothing manufacturer, "As I said, to me that was one of the key elements of this business and having it be a viable, successful business was having a low-cost manufacturing production capability. In order to expand the business, grow the business, you had to be able to compete on a price basis."

Russell Bentley testified, "I understand what a partnership and a partnership agreement are. They're two separate things." Asked whether he is aware of a type of partnership where there is not an agreement in place to share profits and losses, Russell Bentley testified, "Absolutely." Asked to give an example, Russell Bentley testified, "Well, like the one we had here with (indiscernible) we had a partnership with them in the true sense of the word, which was a relationship between two parties for business purposes to -- each one had their own responsibilities. Gayla designed, they manufactured and supplied fabric and shipped. That was the -- those were the responsibilities between the parties. We paid for their -- we paid for the

fabrics and the manufacturing over there, so money transpired between us. In my mind, that's a partnership. But we didn't have a separate agreement. We didn't have a written agreement about that. It was an understanding that we would try to build the Gayla Bentley business. And they were very excited about it."

It is clear to the Court that Metz did not understand the reference to the word "partner" in relation to the overseas clothing manufacturer to mean that Gayla Bentley L.P. was representing that it had an agreement to share profits and losses with KSP Hoodvian. Metz' testimony does not indicate that he believed, as his counsel would have it, that use of the word "partner" necessarily meant a legal relationship between the parties to share profits and losses. The Court finds that Metz understood properly that the representations concerning a partner meant that the company had a low-cost manufacturer lined up to produce clothing. The Court finds that use of the term "partner" in the business plan to refer to the company's clothing manufacturer was not misleading. . .

## F. Celebratory lunch

Casademont testified about events after the Bentleys presented their proposal in April 2006. Casademont testified, "To my recollection, I went away for the summer to our home in Nantucket and I saw Gayla once thereafter at a lunch at a restaurant on Montrose where she further described -- actually, she, I think, presented it as a celebratory lunch, that the business was off and running and extremely exciting, according to her." Casademont testified that she, Gayla Bentley, and Lea Fastow met at a restaurant in the Montrose area. "We sort of caught up because I hadn't seen her since April, I think. And Lea Fastow was a friend from -- through St. John's and our children were in school together. But it was really to tell me how far they had come, even in the time since we had met in April. Lea, at that time, was working in some financial capacity with Gayla's firm. So it was really more or less a business lunch."

Casademont testified that at lunch in Montrose, Gayla Bentley told her, "That they were only approaching a few people and that we were one

of the few couples that they were talking to and that it was a great investment opportunity, that they were already up and running. I believe she had said she had been to Hong Kong and had been choosing fabrics. To my recollection, I think she and Lea had actually gone to Hong Kong. And she said it was exciting and her dream was coming true."

Casademont testified, "They were celebrating the growth of the business and more partnerships with more companies like -- they already had Dillard's. I didn't know about Bloomingdale's, but there were other stores like that that they were either about to partner with or already partnering with." Casademont testified that as to Neiman Marcus, "I was told it had gone from online to in the stores."

Casademont testified that she talked with her husband after the lunch. Casademont testified, "I told him about what Gayla had told me, which was it was the fastest growing market for the -- plus size clothing for women was the fastest growing market of any clothing in women's clothing and that they -- she had hit on several great designs that I had seen in her

showroom, and that she had an arrangement with Dillard's and Neiman's and the business was only growing."

Casademont testified that after that lunch, "I believe Russell called Michael; and, to the best of our knowledge, he, Russell, went in to Michael's office and presented the business plan." The Court finds that as Metz was not present at the lunch, no representations were made to him by the Bentleys at the lunch. The Court finds that to the extent Casademont made representations to her husband about Gayla Bentley, L.P. based wholly or in part on what she heard at lunch, the Bentleys are not liable to Metz for any such representations.

## G. September 2006

Metz testified,  he looked at the same business plan twice, once in April 2006 and a second time at a meeting with Russell Bentley in September 2006.(Doc. 49, p. 48.) Metz explained,"I mean, we didn't have a specific discussion going through line by line of the business plan. It was more, you know: Our -- our presentation remains the same, and our plan

remains the same as far as breaking into, you know, the Dillard's and the --

the retail business; because they were already on line. It was -- it was

getting into the retail end... "we were both convinced that it was a -- you

know, a viable business." Metz never asked for any other financial

information other than what was presented to him in the business plan.

## H. Eyewear and Russell Bentley's consulting work

Sometime after the creation of the November 2005 business plan, the

Bentleys had the opportunity to have a showing of prescription eyewear.

Russell Bentley testified about the eyewear aspect of the business, "We had

an optometrist that Gayla had met in Paris that was coming to our

showroom to -- and she would bring frames with her and we would call a

number of our private clients into the showroom and they would fit glasses

and put on the glasses and take orders for these glasses. At the same time,

they would have an opportunity to shop within our showroom and buy

apparel our accessories and things like that. So it was a way of marketing

our own accessories, as well as bringing in extra income." The eyewear

business was not part of the company's business at the time the November 2005 business plan was created. Income from the eyewear business is not included in the November 2005 business plan historical financial data or in the income projections. The Bentleys never discussed the eyewear project with Metz, but Gayla Bentley sent an invitation to the eyewear show to Clare. According to the Gayla Bentley L.P. Profit & Loss January through December 2006, prescription eyewear brought in $450.00 in 2006 and $84,585 in 2007.

In addition to sales of eyewear, Russell Bentley's consulting work brought in income to Gayla Bentley L.P. Income from Russell Bentley's consulting business is not included in the November 2005 business plan. Russell Bentley's consulting work brought in $35,018.83 in income to Gayla Bentley L.P. in 2006 and $95,694.83 in 2007.

## I. Convertible promissory note

On October 10, 2006, Russell Bentley in his capacity as chief executive officer of Gayla Bently, L.P. executed a Convertible Promissory

Note in the original principle amount of $100,000, bearing interest at 8.0% per annum, in favor of Michael M. Metz and Clare T. Casademont. Upon execution of the note, Michael Metz gave Bentley a check in the amount of $100,000.00 payable to Gayla Bentley, L.P. (Exhibit B03.) The note was convertible to an equity interest in Gayla Bentley L.P. Metz testified about the structure of the investment as a convertible note, "Well, it was presented as a note where you would have -- you would either get interest paid back over a five-year period -- I think the total of return was supposed to be 8 percent -- or you would have the option after a period of time -- I believe after three years -- to convert the note into equity." The note is nonrecourse and states:

> No recourse shall be had for the payment of the principal of this Note against any future incorporator or any past, present or future partner, stockholder, officer, director, agent or attorney of the Company, either directly or through the Company or any successor corporation, all such liability being waived, released and surrendered by the Holder hereof by the acceptance of this Note.

The note matured on September 25, 2011, and has not been paid.

Metz explained he never exercised the option to convert the $100,000 note into equity shares of Gayla Bentley, L.P. Metz testified that he expected to be repaid the same principle with interest at some point. Metz never made demand for payment on the note. The Court finds Metz knew the note was norecourse as to Russell & Gayla Bently. Metz testified that he thought Russell Bentley was obligated on the note in his individual capacity but the Court finds this is not credible. The Court further finds that Metz' never asked about the finances of Gayla Bentley, L.P. other than the representation made in Novermbe 2005 business plan. The Court finds that all verbal and written representations made by the Bentley's to Metz were true.

## II. Conclusions of Law

Bankruptcy Code § 523(a)(2) provides in part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing--

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive . . .

11 U.S.C. § 523 (a)(2)(A) and (B).

"For a debt to be nondischargeable under section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance." *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005) (citing *In re Mercer*, 246 F.3d 391, 403 (5th Cir.2001).) To satisfy the *scienter* requirement, the debt must be one obtained by fraud involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *Id.* (citing

*In re Martin*, 963 F.2d 809, 813 (5th Cir.1992).) An intent to deceive may be inferred from a reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation, but an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive. *Id.* Thus, a "dumb but honest" defendant does not have scienter. *Id.* "Justifiable reliance incorporates 'the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than of the application of a community standard of conduct in all cases.'" *Field v. Mans*, 516 U.S. 59, 70–71 (1995); *see also Grant Thornton LLP v. Prospect High Income Fund,* 314 S.W.3d 913 (Tex. 2010) ("In measuring justifiability of reliance, as required for a fraud or negligent misrepresentation claim, the Supreme Court must inquire whether, given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part.") All

exceptions to discharge under § 523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *In re Hudson*, 107 F.3d 355, 356 (5th Cir.1997).

"Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995). "In order to prove nondischargeability under an 'actual fraud' theory, the objecting creditor must prove: "(1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations." *Id.*

Under § 523(a)(2), false representations and false pretenses encompass statements that falsely purport to depict current or past facts.

*Matter of Bercier*, 934 F.2d 689, 692 (5th Cir. 1991). A promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise subsequently is breached. *Matter of Allison*, 960 F.2d 481, 484 (5th Cir. 1992). "A debtor's misrepresentations of his intentions, however, may constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised." *Id.*

Fraud by non-disclosure is a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts. *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997). Reliance is an element of fraud by non-disclosure. *Id.* "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required." *In re Mercer,* 246 F.3d 391, 404 (5th Cir. 2001) (citing Restatement (Second) of Torts, §§ 550, 551; *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089 (9th Cir.1996).) Under Texas law, to

succeed on a claim for common-law fraud based on nondisclosure there must be a duty to disclose and proof that the defendant concealed or failed to disclose a material fact that he knew the plaintiff was ignorant of or did not have the opportunity to discover, that he intended to induce him to take some action by concealing or failing to disclose the material fact, and that the plaintiff suffered as a result of acting on the defendant's nondisclosure. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) (citing *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex.2001).) "Where there is a duty to disclose, "[c]ourts in Texas have consistently held that fraud by nondisclosure or concealment requires proof of all of the elements of fraud by affirmative misrepresentation, including fraudulent intent, with the exception that the misrepresentation element can be proven by the nondisclosure or concealment of a material fact in light of a duty to disclose." *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 567–58 (5th Cir.2005).

Texas law does not recognize a general duty to disclose facts in a

commercial setting when a party makes a partial disclosure that, although true, conveys a false impression. *Bradford v. Vento* 48 S.W.3d 749, 755-756 (Tex. 2001) ("Several courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. The Restatement (Second) of Torts section 551 also recognizes a general duty to disclose facts in a commercial setting. Restatement (Second) of Torts § 551 (1977). In such cases, a party does not make an affirmative misrepresentation, but what is said is misleading because other facts are not disclosed. We have never adopted section 551.") The Texas Supreme Court has never adopted Restatement (Second) of Torts § 551 which includes the duty to disclose to another subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so. *SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347 (Tex.1995) ("This Court has cited section 551 only once, *Smith v. National Resort Communities*, 585 S.W.2d

655, 658 (Tex.1979), but has never embraced it as a rule of law in Texas");

*but see Field v. Mans*, 516 U.S. 59, 71, n. 9 (1995) ("We construe the terms

in § 523(a)(2)(A) to incorporate the general common law of torts, the

dominant consensus of common-law jurisdictions, rather than the law of

any particular State.")

"The generally accepted rule in Texas jurisprudence is that future

predictions and opinions, especially those regarding the future profitability

of a business, cannot form a basis for fraud as a matter of law." *Zar v. Omni*

*Indus., Inc.*, 813 F.2d 689, 693 (5th Cir.1987); *see also Trenholm v.*

*Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983) (Expressions of opinion are not

actionable as a basis for fraud except that an expression of an opinion may

constitute fraud if the speaker has knowledge of its falsity or if the opinion

relates to the happening of a future event and the speaker purports to have

special knowledge of facts that will occur or exist in the future.); *Transp.*

*Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex.1995) ("[A]n expression

of opinion about monetary value is not a representation of fact which gives

rise to an action for fraud.") The Court finds that Metz has failed to prove

debtors committed actual fraud, false pretenses or made a false

representation in connection with his loan to Gayla Bentley L.P.

Metz complains that debtors failed to tell him or to include in the

November 2005 business plan information about Gayla Bentley L.P.'s

actual financial condition such as that shown in the company's QuickBooks

generated profit and loss statement as of year end 2006. Specifically, Metz

complains that the Bentleys failed to tell him the following:

> Q Now, the business plan that you looked at and that you were
> looking at again in September of 2006 with Mr. Bentley in your
> office was forecasting sales of the three Gayla Bentley lines of
> $860,000, right?
>
> A Correct. Yeah.
>
> Q At any time did Mr. Bentley tell you, "We're not going to
> make it; we're not even close"?
>
> A I don't remember him saying we're not going to make it or
> we're not even close.

Doc. 49, p. 48-49.

Did he qualify any of the numbers in this business plan as of

September of 2006?

A Not that I remember, no.

Doc. 49, p. 49.

Q Was there anything about any of the financial projections in the business plan that Mr. Bentley told you were inaccurate or even possibly inaccurate?

A No.

Doc. 49, p. 49.

Q Was there anything about the cost or the cost of goods sold or operating expenses that Mr. Bentley, as you talked about this business plan, would tell you are either inaccurate or they might not be accurate?

A No. I mean, we didn't have a specific discussion going through line by line of the business plan. It was more, you know: Our -- our presentation remains the same, and our plan remains the same as far as breaking into, you know, the Dillard's and the -- the retail business; because they were already on line. It was -- it was getting into the retail end.

Doc. 49, p. 50-51.

Q As of October 10, 2006, had the Bentleys, either of them, told you at any time that the company was insolvent?

A No.

Doc. 49, p. 52.

> Q At any time prior to October 10, 2006, did either of the Bentleys tell you that the company was losing money and would have no net income in 2006?

> A No.

Doc. 49, p. 52.

> Q Did the Bentleys tell you at any time that they had kept the company alive, if you will, by borrowing from their 401(k) and with their credit cards?

> A Definitely not.

Doc. 49, p. 52.

Each of the foregoing alleged omissions relates to the financial condition of Gayla Bentley L.P. Oral representations about a debtor or insider's financial condition cannot be held nondischargeable under § 523(a)(2)(B). *In re Bandi*, 683 F.3d 671, 676 (5th Cir. 2012) ("'Financial condition' misrepresentations are . . . made non-dischargeable under 523(a)(2)(B), but only if they are in writing."); *In re Steves*, 482 Fed. Appx. 912, 914 (5th Cir. 2012) ("Under § 523(a)(2)(A), oral misrepresentations

can except a debtor from discharge only if they are not about the 'financial condition' of the debtor.") In *In re Bandi*, 683 F.3d 671, 676 (5th Cir. 2012), the Fifth Circuit explained the meaning of "a statement respecting the debtor's or an insider's financial condition" as used in § 523(a)(2):

> The term "financial condition" has a readily understood meaning. It means the general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities. A representation that one owns a particular residence or a particular commercial property says nothing about the overall financial condition of the person making the representation or the ability to repay debt. The property about which a representation is made could be entirely encumbered, or outstanding undisclosed liabilities of the person making the representation could be far more than the value of the property about which a representation is made.

683 F.3d at 676.

"[B]alance sheets, income statements, statements of changes in overall financial position, or income and debt statements . . . present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities." *In re Bandi*, 683 F.3d 671, 677, n. 29 (5th Cir. 2012) (citing *In re Joelson*, 427 F.3d 700, 714 (10th Cir. 2005)). The Court finds that the

fact that debtors did not orally inform Metz about the actual overall financial condition of Gayla Bentley, L.P. immediately prior to his loan is not actionable under 11 U.S.C. § 523(a)(2)(A) or (B).

Moreover, as to the specific alleged omission that debtors' failed to tell Metz that debtors "kept the company alive" by using "their credit cards" or "by borrowing from their 401(k)," the Court finds that the evidence shows that the Bentleys used Gayla Bentley L.P. company credit cards, not personal credit cards, for the company's operations. Further, the evidence shows that Russell Bentley withdrew funds from his 401(k) account after he left Duke Energy and  contributed the funds to the company as "seed money" when he joined his wife in the business full time in 2003.  (Doc. 49, p. 215.) There is no evidence these 401(k) funds were required to be repaid or that the Bentleys continued to withdraw 401(k) funds three years later in October 2006 when Metz made his loan to the company.

The November 2005 business plan is the only writing presented to

Metz concerning the overall financial health of Gayla Bentley, L.P. Metz, however, does not contend that any of the historical financial information presented in that document is inaccurate. The Court finds that the historical financial information included in the November 2005 business plan is true and does not misrepresent the overall financial condition of Gayla Bentley, L.P.

Further, the Court finds that at the time he loaned $100,000 to Gayla Bentley, L.P. in October 2006, Metz knew that the actual financial information contained in the November 2005 business plan was a year old. The Court finds that Metz also knew that the projected profitability of the company for 2006 had not been achieved because he knew the projections were dependent on Gayla Bentley L.P.'s placement of its mid-priced clothing line in a "brick and mortar" nationwide retail chain, such as Dillards, so that the line could be marketed to the targeted "mass market" mid-price clientele. Metz also knew at the time he lent the business $100,000, that the company was not yet selling its clothes in Dillards or in

any other "brick and mortar" nationwide retail chain. The Court finds that Metz knew that the financial projections contained in the business plan showing profitable operations after October 2005 were not representations of historical financial performance as of October 2006. Metz knew that the November 2005 business plan that he read in September 2006 was the identical document that he had read in April 2006 and had had in his possession since that time. The Court finds that Metz knew that the projections contained in the November 2005 business plan that he had read in April 2006 and had read a second time in September 2006, had not been transformed from future projections to historical fact simply because the time period covered by some of the projections was, as of September 2006, in the past.

The Court finds that the April 2006 letter is not a statement of the debtors' or an insider's financial condition, thus Metz must prove fraud under § 523(a)(2)(A). The Court has found however, that none of the representations made in the April 2006 letter is false. The Court concludes

that Metz has failed to prove a non-dischargeable debt as a result of the April 2006 letter.

To the extent that Metz complains about any representations made by the Bentleys to Casademont, the Court finds any such representations are not actionable by Metz. *See Westcliff Co. v. Wall*, 267 S.W.2d 544 (Tex.1954) ("Person making a representation is accountable for truth of such statement only to person or persons whom he sought to influence by such representation.")

Metz contends that debtors have violated Tex. Rev. Civ. Stat. art. 581-33(A)(l) and (A)(2). Metz contends that as a result of such violation, his debt is nondischargeable under Bankruptcy Code §523(a)(19) which states:

(a) A discharge . . . does not discharge an individual debtor from any debt–

. . . . (19) that--
(A) is for--
(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange

Act of 1934), any of the State securities laws, or any regulation
or order issued under such Federal or State securities laws; or
(ii) common law fraud, deceit, or manipulation in connection
with the purchase or sale of any security; and
(B) results, before, on, or after the date on which the petition
was filed, from--
(i) any judgment, order, consent order, or decree entered in any
Federal or State judicial or administrative proceeding;
(ii) any settlement agreement entered into by the debtor; or
(iii) any court or administrative order for any damages, fine,
penalty, citation, restitutionary payment, disgorgement
payment, attorney fee, cost, or other payment owed by the
debtor.

11 U.S.C. §523(a)(19).

Metz alleges that the Bentleys violated Tex. Rev. Civ. Stat. art.

581-33(A)(l) and (A)(2). Tex. Rev. Civ. Stat. art. 581-33(A)(l) states:

A. Liability of Sellers. (1) Registration and Related Violations.
A person who offers or sells a security in violation of Section
7, 9 (or a requirement of the Commissioner thereunder), 12,
23C, or an order under 23A or 23-2 of this Act is liable to the
person buying the security from him, who may sue either at law
or in equity for rescission or for damages if the buyer no longer
owns the security.

Tex. Rev. Civ. Stat. art. 581-33(A)(l).

The Court finds that Metz seeks monetary damages against the

Bentleys, not rescission. Pursuant to the express terms of the statute, to sue

for damages under Tex. Rev. Civ. Stat. art. 581-33(A)(l), Metz must no

longer own the security. The Court finds that Metz has failed to prove that

he no longer owns the security and therefore is precluded by the terms of

the statute from suing for damages. Without a debt for monetary damages,

Metz has no basis for a non-dischargeability complaint under 11 U.S.C.

§523.

Notwithstanding the foregoing, Metz contends that the Bentleys are

liable to him under subpart (A)(l) of Tex. Rev. Civ. Stat. art. 581-33

because they allegedly violated section 9C of the statute. Section 9C states:

> C. In connection with any permit to sell securities the
> Commissioner shall require all offers for sale of said securities
> to be made through and by prospectus which fairly discloses the
> material facts about the plan of finance and business. Said
> prospectus shall be filed with and approved by the
> Commissioner; provided, however, if the applicant files a
> prospectus or offering circular with the Commissioner which is
> also filed with the S.E.C. under the Securities Act of 1933, as
> amended, or the regulations thereunder, this subsection shall in
> all respects be satisfied. Failure to comply with this requirement
> shall be treated as a violation of this Act, subjecting the parties
> responsible to the consequences thereof as provided herein.

Tex. Rev. Civ. Stat. art. 581-9C.

The Court finds that Metz has failed to prove any facts making Tex. Rev. Civ. Stat. art. 581-9C applicable to his loan to Gayla Bentley L.P. The Court finds that Metz has failed to prove a cause of action under Tex. Rev. Civ. Stat. art. 581-33(A)(l) based on 9C.

Subpart (A)(2) of the statute states:

(2) Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under Section 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security.

Tex. Rev. Civ. Stat. art. 581-33(A)(2).

To prevail on an Article 581–33A(2) claim, the plaintiff must prove that (1) the defendant offered or sold a security, (2) defendant made an untrue statement (or omission), and (3) the omission or untrue statement is the means by which the sale of the security was made. *Arkoma Basin Project Ltd. Partnership v. West Fork Energy Co. LLC*, 384 Fed. Appx. 375, * 380 (5th Cir. 2010). A claim under Article 581–33A(2) for an untrue promise of future performance requires proof that the defendant had no intention of performing the promise at the time it was made. *Id.* (citing *Herrmann Holdings Ltd. v. Lucent Technologies Inc.*, 302 F.3d 552, 563 (5th Cir. 2002); *Wood v. Combustion Eng'g, Inc.*, 643 F.2d 339, 345 (5th Cir.1981).); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 344, n. 5 (5th Cir. 2008) ("Although intent or scienter is not an element of a claim under article 581–33 for an untrue statement of an existing fact, we have held that intent or scienter is an element of a claim under article 581–33 for an untrue promise of future performance.")

As is the case with his cause of action under Tex. Rev. Civ. Stat. art. 581-33(A)(1), Metz has failed to prove that he no longer owns the security, as required by the express language of Tex. Rev. Civ. Stat. art. 581-33(A)(2) for one seeking damages. The Court finds that Metz is precluded by the terms of the statute from suing for damages as he continues to own the promissory note. Without a debt for monetary damages, Metz has no basis for a non-dischargeability complaint under 11 U.S.C. §523.

Metz has not stated which representation made in the November 2005 business plan is untrue or misleading or what material fact was omitted by the Bentleys in their presentation to him prior to his loan to the company. To the extent that Metz alleges that the sales projections contained in the November 2005 business plan were untrue, the Court finds that the November 2005 business plan's sales projections are not untrue statements of material facts. In particular, the Court finds that the dates stated in the November 2005 business plan by which the projected sales increases would

be achieved were not statements of material fact and the Bentleys failure to update those dates whether in writing or in conversation with Metz to state that accomplishment of the projected sales still lay in the future does not constitute an omission of material facts that were necessary to make the November 2005 business plan not misleading. Moreover, the Court finds that the Bentleys' failure in October 2006, to specifically bring to Metz' attention that the projections contained in the November 2005 business plan covering the period from November 2005 through October 2006 had not been met was not an omission of a material fact necessary to make the projections contained in the November 2005 business plan not misleading. Further, the Court finds that the Bentleys believed the November 2005 sales projections were accurate at the time they made them and that even as late as October 2006, they believed they could accomplish the sales increases shown for that year.

The Court finds that Metz has failed to prove any liability to him for damages or otherwise under the Texas Securities Act. The Court finds that

Metz has failed to prove that the Bentleys violated any state or federal securities laws or are liable to him for common law fraud, deceit, or manipulation in connection with the purchase or sale of a security. The Court finds that Metz has failed to prove a nondischargeable debt under 11 U.S.C. §523(a)(19).

### III. Conclusion

Based on the foregoing, it is

**ORDERED** that the debt of Michael Metz is **DISCHARGED.**

Signed this _3rd_ day of _June_, 2015 at Houston, Texas.


KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE